Filed 1/8/25  In re P.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re P.S. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>G.S. et al.,<br><br>Defendants and Appellants. | F088393<br><br>(Super. Ct. Nos. JD144008-00, JD145357-00)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant G.S.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant M.G.

Margo A. Raison, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Detjen, Acting P. J., Peña, J. and Meehan, J.

**INTRODUCTION**

G.S. (Father) and M.G. (Mother) filed timely notices of appeal following the termination of their parental rights to now two-year-old P.S. and one-year-old A.S. (the children) under Welfare and Institutions Code section 366.26.[1] Father, joined by Mother, claims the juvenile court erred when it found the parental-benefit exception did not apply and terminated their parental rights.[2] (§ 366.26, subd. (c)(1)(B)(i).)

Kern County Department of Human Services (the Department) disputes there was any error and seeks affirmance of the juvenile court's order.

We find no error and affirm.

**FACTUAL AND PROCEDURAL HISTORY**[3]

**I.      P.S.'s Removal and Detention**

P.S. was born approximately six weeks premature in August 2022. She had a cleft palate, which caused feeding difficulties, and, after her discharge from the hospital in September 2022, she was regularly monitored by a pediatrician to ensure weight gain. She lived with Father and Mother, who were unmarried and in an intact relationship, her maternal grandparents, and her half-sibling, four-year-old V.M.

In late October 2022, Mother took P.S. to urgent care because P.S. and V.M. were both "nasally" after a visit to the park. Two days later, Mother took P.S. to urgent care again because she heard a "popping sound" in P.S.'s left shoulder and felt what she

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]     The juvenile court found the parental-benefit exception applied to V.M., who is P.S.'s and A.S.'s now six year-old half-sibling, and the court's orders concerning V.M. are not at issue in this appeal.

[3]     We limit our summary to those facts relevant to disposition of this appeal. Father and Mother denied any Native American ancestry, a Department social worker represented at the disposition hearing that extended relatives and the parents denied Native American or Alaskan-Eskimo ancestry, and the parents do not claim any error with respect to the court's ICWA finding. (Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA); § 224.2, subd. (i)(2).) Therefore, we do not include facts relating to the Department's ICWA inquiry.

thought was a nerve moving in P.S.'s shoulder. An X-ray was taken, but no fractures or other injuries were noted, and the doctor advised Mother P.S. would grow out of the popping sound. Several days later, Mother took P.S. to the hospital after maternal grandmother heard the sound and advised her to do so.

P.S. had no visible injuries but X-rays revealed two healing rib fractures, three acute rib fractures, and a corner fracture to her femur. She also had several chip fractures, indicative of pulling and twisting of bones. Mother denied she or Father had harmed P.S., said P.S. had not been dropped or been in a car accident, and had no explanation for the injuries. Hospital staff arranged P.S.'s transfer to Valley Children's Hospital for further assessment and initiated a referral to the Department and law enforcement based on possible child abuse.

Responding officers interviewed Father at home. He was unable to offer any explanation for P.S.'s injuries. V.M. had no visible injuries, and she appeared happy and healthy. No concerns were noted during a welfare check of the home, which had running water, electricity, ample food, and beds for the children.

P.S. was admitted to Valley Children's Hospital and a doctor concluded her injuries were suspicious and nonaccidental, but additional rule-outs were needed. Subsequent testing ruled out bone weakness or disease, and pre-existing conditions, but osteogenesis imperfecta had not yet been ruled out. P.S.'s doctor reported that one of her injuries indicated some form of pulling or twisting, which caused concern. He also explained that it is not uncommon for newborns not to feel pain from the type of fractures P.S. sustained.

P.S., as well as VM., was taken into protective custody and, on November 4, 2022, the Department filed a petition alleging P.S. came within the jurisdiction of the juvenile court under section 300, subdivisions (a) (serious physical harm) and (e) (severe physical abuse upon a child under five years of age). The Department's detention social study reflected no prior child protective services history or criminal history for Father or

3.

Mother, and both parents denied any history of domestic violence, mental illness or substance abuse.

On November 7, 2022, the juvenile court held a detention hearing. The court elevated Father's status to presumed father of P.S., reserved the issue as to V.M.,[4] found a prima facie showing had been made that P.S. was a person described by section 300, and ordered her detained from Father and Mother and placed in the temporary custody of the Department. The court ordered two-hour supervised visitation twice a week.

## II. A.S.'s Removal and Detention

A.S. was born in November 2023. On December 1, 2023, after learning Mother had given birth, the Department filed a petition alleging A.S. came within the jurisdiction of the juvenile court under section 300, subdivision (a) (risk of serious physical harm), based on the nonaccidental infliction of injury to P.S. The juvenile court issued a protected custody warrant and A.S. was detained.

On December 5, 2023, the juvenile court held a detention hearing. The court elevated Father's status to presumed father of A.S., found a prima facie showing had been made that she was a person described by section 300, and ordered her detained from Father and Mother and placed in the temporary custody of the Department. The court ordered two-hour supervised visitation twice a week.

## III. Jurisdiction and Disposition Hearings

The combined jurisdiction and disposition hearing for P.S. and V.M. was continued multiple times given the need to first obtain medical records, then investigate whether there was any genetic or other medical explanation for P.S.'s bone fractures, and finally resolve several remaining issues once genetic testing was completed. On March 4, 2024, after the existence of an underlying genetic or other medical explanation had been ruled

---

[4] Mother identified M.M. as V.M.'s father and testified he is deceased. The court elevated M.M. to V.M.'s presumed father at the hearing and reserved Father's request to be elevated to her presumed father.

out, the juvenile court held a contested jurisdiction hearing. Mother testified that she became aware of P.S.'s fractures after taking her to the hospital in October 2022. Father testified, against the advice of counsel, and stated that he first became aware of P.S.'s injuries when Mother took her to the hospital for the popping sound. He denied knowledge of any injuries prior to that date and said P.S. did not appear to be in any distress or pain. Father denied he caused the injuries, would ever cause such injuries, knew who caused the injuries, or, if aware who caused the injuries, would cover for that person. He also testified A.S. was living with them for approximately three weeks, unsupervised, before she was taken into protective custody and there were no issues or injuries to her.

The juvenile court expressly found the parents' testimony not credible regarding P.S.'s nonaccidental injuries. The court sustained the petition allegations and found P.S. was a person described under section 300, subdivisions (a) and (e), and V.M. and A.S. were persons described under section 300, subdivision (a). The disposition hearing was continued 30 days.

On April 2, 2024, the juvenile court held a disposition hearing. The parents did not testify, but Mother's counsel made an offer of proof that if called to testify, Mother would testify she completed her parenting and child neglect courses. Father's counsel made an offer of proof that Father would testify he completed his voluntary case plan in its entirety. The court made a finding that ICWA does not apply; adjudged the children dependents of the court; found by clear and convincing evidence that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if returned home; and found there were no reasonable means by which their physical health could be protected without removing them from Father's and Mother's physical custody. The court acknowledged the parents had completed classes, but observed they had taken no responsibility for the physical abuse of P.S. or

5.

demonstrated any insight into the situation. The court bypassed reunification services pursuant to section 361.5, subdivision (b)(5) and (6), and set a section 366.26 hearing.

## IV.    Termination of Parental Rights

### A.    Testimony

On July 25, 2024, the juvenile court held a contested section 366.26 hearing. P.S. was then almost two years old and A.S. almost nine months old. Mother testified she and Father visited the children three times a week for two hours at a time and had not missed any visits, except when the children were sick or out of town.[5] Mother stated P.S. smiled during visits and, with her hands, asked to be carried. Mother also said P.S.'s eyes watered when it was time to put her in her carseat at the end of the visit and she held up her hands to be picked up, and A.S. cried a few times when put in her carseat.

Father testified that P.S., who was still nonverbal,[6] held out her hands to him like she wanted to be picked up, and she knew him. When the visits ended, she wanted to be taken back out of her carseat and she cried. He testified A.S. also knew him, would smile at him, and hated being put in her carseat at the end of the visit. He described their relationship as "father/daughter."

L.P., a Department social worker assigned to the children's adoption case approximately three months earlier, testified that visits between the parents and the children were positive. The parents brought food and ate together as a family, and they engaged with the children and tended to them. She observed the children were a little upset when the visits ended and P.S. cried, but that had decreased. She testified she had reviewed the case file and she agreed with the Department's recommendation that

---

[5]    The parties stipulated to regular and consistent visitation.

[6]    P.S. had moderately severe to profound hearing loss in both ears, but, with hearings aids, was responsive to sound. P.S.'s caregiver reported that in April 2024, she had ear tubes inserted and cleft palate surgery, and she was thriving.

parental rights be terminated even as to V.M., who expressed a desire to return to Father and Mother.

**B.    Ruling**

The court observed that P.S. had been in protective custody her entire life with the exception of the first three months and A.S. had been in protective custody her entire life with the exception of the first three weeks.  The court recognized there was no dispute Father and Mother visited regularly and consistently, or that the visits were positive and enjoyed by the children, but the court did not find any evidence of a *substantial* positive emotional attachment to either parent.  (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)  The court weighed the detriment of severance against the benefit of adoption and concluded the detriment did not outweigh the benefit of adoption.  (*Id.* at p. 633.)  The  court found P.S. and A.S. adoptable and found the parental-benefit exception did not apply.  The court terminated Father's and Mother's parental rights to P.S. and A.S., and set adoption as their permanent plan with their respective caregivers designated as the prospective adoptive parents.[7]  (§ 366.26.)

Father and Mother appealed.

**DISCUSSION**

**I.    Legal Principles**

**A.    Beneficial Parent-child Relationship Exception**

At a section 366.26 hearing, the juvenile court must determine "whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan." *(Caden C., supra*, 11 Cal.5th at p. 625.)  "[T]he goal at the section 366.26 hearing is 'specifically … to select and implement a permanent plan for the child.'" (*Id.* at p. 630.)  "[T]he question before the court is decidedly not whether

---

[7]    P.S. and V.M. were placed with the same caregivers, who committed to a permanent plan of legal guardianship over V.M. given the juvenile court's determination that the parental-benefit exception applied to her.  A.S. was placed with different caregivers than her sisters.

7.

the parent may resume custody of the child." (*Ibid.*) Instead, "when the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Ibid.*)

However, "[e]ven when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute." (*Caden C., supra*, 11 Cal.5th at p. 629.) "[W]hen a parent establishes that one of the exceptions applies, adoption or termination is not 'in the best interest of the child.'" (*Id.* at p. 631.) Under the beneficial parent-child relationship exception to termination of parental rights, at issue here, the parent must establish, by a preponderance of the evidence, "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Ibid.*) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.] Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here, as throughout, the focus is on the best interests of the child." (*Caden C., supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C., supra*, 11 Cal.5th at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also *id.*, subd. (c)(1)(D).) Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.)

"In each case, … the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent.

(§ 366.26, subd. (c)(1)(B)(i), italics added.)" (*Caden C., supra*, 11 Cal.5th at pp. 633–634.)

## B. Standard of Review

We review the juvenile court's findings on the first two elements for substantial evidence. (*Caden C., supra*, 11 Cal.5th at p. 639.) As to the third element, a hybrid standard applies. "[T]he court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Id.* at p. 640.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' [Citations.] Uncontradicted testimony rejected by the trial court '"cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved."'" (*Caden C., supra*, 11 Cal.5th at p. 640.)

"Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when

""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."" [Citation.] But ""[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."" (*Caden C., supra*, 11 Cal.5th at p. 641.)

## II. No Error

Father, joined by Mother, claims that the juvenile court, in finding P.S. and A.S. were adoptable and no exception applied, failed to follow the *Caden C.* analysis. """We must indulge in every presumption to uphold a judgment, and it is [appellants'] burden on appeal to affirmatively demonstrate error—it will not be presumed."" (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1161 (*A.L.*).) Further, "'[i]n the absence of evidence to the contrary, we presume that the court "knows and applies the correct statutory and case law."" (*People v. Jones* (2017) 3 Cal.5th 583, 616, quoting *People v. Thomas* (2011) 52 Cal.4th 336, 361; accord, *People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) In this instance, the record does not support an argument that the court did not know the law or did not follow the law. The record expressly reflects that the court considered the three elements articulated in *Caden C.* The juvenile court found regular visitation and contact, and it found a positive emotional attachment to Father and Mother, but not a *substantial* one. (*Caden C., supra*, 11 Cal.5th at p. 636.) On the final element, the court concluded that the harm from severing P.S.'s and A.S.'s relationship with Father and Mother did not outweigh the benefit to the children of placement in a new adoptive home. (*Id.* at p. 633.) However, the court found the exception applicable with respect to V.M., who had spent the first four years of her life with Mother and consistently expressed her desire to return to Father and Mother.

Father and Mother bear the burden of demonstrating that terminating the children's substantial, positive attachment to them "would be detrimental to [them] even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.,*

*supra*, 11 Cal.5th at p. 636.)  The juvenile court was required to evaluate the strength and quality of the children's relationship with Father and Mother in determining whether termination would be detrimental.  (*Id.* at p. 634; *A.L., supra*, 73 Cal.App.5th at p. 1157.) "Interaction between natural parent and child will always confer some incidental benefit to the child" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575), and the evidence showed a general bond between Father and Mother and the children that was positive, which the juvenile court recognized.  However, the parents did not present any evidence that spoke to the specific strength or quality of the bond, and the juvenile court found the bond positive, but not substantial.

P.S. was three months old when removed from Father's and Mother's home, and she had been with her prospective adoptive parents for the past 12 months.  A.S. was three weeks old when removed from Father's and Mother's home, and she had been with her prospective adoptive parents since her detention.  As both children had been out of the parents' care for most of their young lives, they were "'too young to understand the concept of a biological parent'" (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 816 (*Andrew M.*)), would not have had any memory of being under their parents' care, and necessarily looked to their caregivers as their primary parental figures.  Their placements were stable and the Department's social study reflects that although P.S. and V.M. resided in one household and A.S. in another, their caregivers were related, the residences were next door to one another, and P.S.'s and V.M.'s caregiver babysat A.S.  Critically, Father and Mother did not offer any evidence, and do not point to any evidence in the record, showing it would be detrimental to P.S. and A.S. if their relationship with the parents was terminated.  Notably, they cite no authority supporting reversal of a juvenile court's determination in circumstances analogous to these.

Father, joined by Mother, also argues that terminating parental rights will mean terminating A.S.'s relationship with P.S. and V.M. because she lives in a different home, and that although P.S. and V.M. live in the same home, they will no longer have the same

12.

parents given V.M.'s permanent plan is legal guardianship. Father contends that without a parental relationship, continued contact will not be assured. The sibling exception to termination of parental rights, however, is a separate exception that was not raised in the juvenile court or on appeal. (§ 366.26, subd. (c)(1)(B)(v); *In re V.S.* (2024) 104 Cal.App.5th 1154, 1168–1169.) Notably, although A.S. has a separate caregiver, the record indicates the three children's caregivers are related and live next door to each other, as previously stated. Further, although parental rights were not terminated as to V.M., her current caregivers committed to a plan of legal guardianship with her. Regardless, this argument does not assist the parents in demonstrating the juvenile court erred when it found the parental-benefit exception did not apply. (See *V.S., supra*, at p. 1169 [juvenile court erred in considering sibling relationship exception sua sponte and in evaluating exception under *Caden C.* factors, which "are specifically tied to the language of section 366.26, subdivision (c)(1)(B)(i), describing the parental relationship exception"]; *Andrew M., supra*, 102 Cal.App.5th at pp. 817–818 ["[t]he parental-benefit exception deals with the child's relationship with the *parents*, and it is not appropriate to consider relationships with other family members in assessing this exception"].)

We have no doubt that Father and Mother love P.S. and A.S. or that their visits with the children were positive in that the children enjoyed the visits. However, "A "'showing [that] the child[ren] would derive *some* benefit from continuing a relationship maintained during periods of visitation"' is not a sufficient ground to depart from the statutory preference for adoption." (*Andrew M., supra*, 102 Cal.App.5th at p. 818, quoting *In re G.H.* (2022) 84 Cal.App.5th 15, 25.) Father and Mother bear the burden of proving the parental-benefit exception applies and they have not demonstrated the juvenile court erred. To the contrary, substantial evidence in the record supports the juvenile court's findings and the court did not abuse its discretion in determining that the exception did not apply. Therefore, we affirm the order terminating the Father's and Mother's parental rights to P.S. and A.S.

**DISPOSITION**

The order terminating Father's and Mother's parental rights to P.S. and A.S. under section 366.26 is affirmed.